UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                         :

STEPHEN M. FRATELLO,            :

                Plaintiff,      :
    -- v. --                :

CAROLYN W. COLVIN,        :
ACTING COMMISSIONER OF    :
SOCIAL SECURITY,         :

                Defendant.   :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/26/14

**REPORT AND RECOMMENDATION**

No. 13-CV-4339 (VSB) (JLC)

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Vernon S. Broderick, United States District Judge:**

Plaintiff Stephen M. Fratello seeks reversal of the determination of Defendant Carolyn

W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), denying his

application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income

("SSI") benefits. The parties have cross-moved for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c). For the reasons that follow, I recommend that Fratello's

motion be granted to the extent that the matter be remanded to the Commissioner for further

proceedings, and that the Commissioner's cross-motion be denied.

## I.   BACKGROUND

### A.  Procedural History

Fratello filed applications for SSDI and SSI benefits on November 18, 2010, alleging that

he had been disabled since December 31, 2007. Administrative Record ("R.") (Dkt. No. 12), at

119, 125. The Social Security Administration ("SSA") denied his applications on December 27,

2010, *id.* at 69, following which Fratello requested an administrative hearing. *Id.* at 82-83.

Represented by counsel, Fratello appeared before Administrative Law Judge ("ALJ") Mark

Sochaczewsky on December 28, 2011. *Id.* at 29-62. In a written decision dated January 12,

2012, ALJ Sochaczewsky found that Fratello was not disabled for purposes of receiving Social

Security benefits. *Id.* at 18-25. On April 22, 2013, the SSA Appeals Council denied Fratello's

subsequent request for a review of the ALJ's decision, which thereby became the

Commissioner's final determination. *Id.* at 1.

On June 21, 2013, Fratello, once again represented by counsel, timely commenced this

action for judicial review. *See* Complaint ("Compl.") (Dkt. No. 2). The Commissioner filed an

answer on January 7, 2014 (Dkt. No. 11). Fratello moved for judgment on the pleadings

pursuant to Rule 12(c) on March 18, 2014. *See* Notice of Motion (Dkt. No. 15); Memorandum

of Law in Support of Plaintiff's Motion ("Pl. Mem.") (Dkt. No. 16). The Commissioner cross-

moved on June 30, 2014. *See* Notice of Motion (Dkt. No. 20); Memorandum of Law in Support

of Defendant's Cross-Motion ("Def. Mem.") (Dkt. No. 21). Fratello submitted a reply brief on

July 15, 2014. *See* Memorandum of Law in Further Support of Plaintiff's Motion (Dkt. No. 23).

## B.     The Administrative Record

### 1.     Fratello's Background

Born on July 19, 1982, Fratello was 25 years old at the time of the onset of his alleged

disability. R. at 119. Fratello attended college for three years but did not earn a degree. *Id.* at

46. He is unmarried and lives with his mother, stepfather, and grandmother in Garnerville, New

York. *Id.* at 45, 120. Fratello has worked a total of three years in 20 or 30 jobs, none lasting

longer than three months, as he was fired for "not doing a good job" or he quit because of

anxiety. *Id.* at 46, 57. His longest tenure was as a retail worker in a vitamin store, but he

managed to keep that position only because the manager was a friend of his; when that manager

2

left, Fratello quit soon thereafter. *Id.* at 55. Fratello's last employment was in December 2007 at a publishing company, where he provided customer service, carried out data entry, and answered phones. *Id.* at 46. In late 2007, Fratello suffered a "nervous breakdown" that has since kept him from finding and maintaining work. *Id.* at 47. Since Fratello applied for disability benefits, he has gone to some job interviews but has never been offered employment. *Id.*

### 2. Medical Evidence

#### a. Treatment at Summit Park Hospital

Fratello received outpatient psychiatric treatment at Summit Park Hospital ("Summit") between October 2008 and September 2010, with a three-month break from March 4 to June 8, 2009. Intake notes dated October 6, 2008 described Fratello's symptoms as: "uncontrollable excessive worry, restlessness, can't concentrate at times, irritable, muscle tension, sleep disturbance, depressed most of the day, some lack of interest in fun things, weight loss, some fatigue at times, excessive guilt, and some indecisiveness." *Id.* at 247-48. They also indicated that Fratello had seen two private therapists over the previous seven months and included a recommendation that he engage in weekly therapy. *Id.* at 248. A mental status risk assessment form also filled out on October 6 reported that Fratello had an appropriate affect and intact memory, but impaired concentration, attention, and judgment. *Id.* at 252.

In a subsequent December 18, 2008 evaluation, Fratello was diagnosed with panic disorder and major depressive disorder. *Id.* at 254. Fratello reported that he "had trouble holding a job" because of anxiety and panic attacks, and suffered from lack of motivation and sleep disturbance, which had begun one-and-a-half years prior. *Id.* at 253. The evaluation added that Fratello had used Lexapro in the past, but had discontinued use because of its side effects, and was at the time using Xanax "sparingly." *Id.* His mood was described as anxious and

3

depressed, and he had appropriate affect and intact judgment and memory, but impaired concentration. *Id.* at 254.

A disposition report dated March 4, 2009 indicated that "all/most" of Fratello's treatment goals had been met and his condition was noted as "improved." He was given a Global Assessment of Functioning ("GAF") score of 60.[1] *Id.* at 261. A discharge summary remarked that Fratello: had "addressed issues of anxieties in social situations, career situations, and his current financial situation"; had "addressed his depression in therapy"; and, was "very eager to work in the helping or education field, but has not been able to find a job." *Id.* at 260.

On June 8, 2009, Fratello was readmitted to treatment at Summit, reporting continued anxiety, panic attacks, and depression. *Id.* at 241. He added that he was worried about his finances, not having a job, and about the recent end of a close friendship. *Id.* The intake notes reflect that he reported concentration problems and was feeling irritable, restless, and frustrated. *Id.* His affect was appropriate, memory and attention intact, but his judgment was impaired. *Id.* at 246. His GAF was rated as 53. *Id.* at 255.

Fratello's treatment at Summit was once again discontinued on September 22, 2010, when he reported some improvement but continued anxiety over employment, finances, and relationships. *Id.* at 258. Fratello stated that he did not have the time to commit to continued therapy at Summit. *Id.* His diagnosis remained panic disorder and major depressive disorder, with a GAF of 53. *Id.* at 259.

---

[1]     The GAF, "a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning," runs from 0 to 100, with "scores between 51-60 indicat[ing] that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376-77, at 34 (4th ed., text revision, 2000)).

4

### b.   Treatment at Good Samaritan Hospital

Even before he terminated treatment at Summit on September 22, 2010, Fratello began

receiving care at Good Samaritan Hospital ("Good Samaritan") on September 2, 2010. *Id.* at

286.  According to his intake notes, while his anxiety had "dissipated" somewhat, it was still

aggravated by stressors, and Fratello met the criteria for post-traumatic stress disorder ("PTSD").

*Id.* at 286.  Fratello reported trouble with concentration and sleeping.  *Id.* at 288.  His GAF was

55.  *Id.* at 293.  He indicated that, though he felt "bleak," he had some "hopefulness" and

planned on returning to school and finding employment.  *Id.* at 289.  At the time, Fratello stated

that he did not wish to see a psychiatrist or consider medication.  *Id.* at 286.

Following a November 2, 2010 examination, Dr. Seymour Kushnir prepared a detailed

evaluation outlining Fratello's psychiatric history and current diagnosis.  *Id.* at 277-79.  Fratello

reported to Kushnir that his problems with anxiety and depression had started in 2007 when he

lost his job, declared bankruptcy, and ended a three-year intimate relationship, all within a three-

week period.  *Id.* at 277.  Fratello also recounted persistent anxiety and panic attacks following

an emotionally and physically abusive relationship that lasted from 2008 to 2009.  *Id.* at 278.

Kushnir described Fratello's difficulties with medications like Lexapro – which Fratello stopped

taking after two months because of "emotional numbness" and "severe sexual effects" – and

Xanax – which Fratello stopped using after increased usage and fears of addiction.  *Id.* at 277.

Kushnir diagnosed Fratello with major depressive order, chronic PTSD, and mood disorder,

assigning a GAF of 55.  *Id.* at 279.  Fratello indicated a desire to continue therapy but a

reluctance to try medication given his previous experiences, to which Kushnir suggested a

prescription for low doses of Zoloft.  *Id.*

Other treatment notes from September through November 2010 document Fratello's

5

anxiety about pressure to return to work. *See id.* at 280-81, 282, 284. They also indicate Fratello's continuing fearfulness about taking medications because of his previous experience with side effects and his intention to apply for SSI. *Id.* at 280. Treatment notes from December 2010 and January 2011 describe Fratello's struggles with holiday-related depression and his thoughts of joining a monastery. *Id.* at 315, 324. According to notes from February 7, 2011, Fratello still displayed a chronically depressed mood, did not want to take medication, and believed the therapy "was not helping." *Id.* at 322. A discharge summary dated March 7, 2011 indicates that Fratello withdrew from treatment, with treatment goals partially met. *Id.* at 317. His GAF was listed at 55, with a diagnosis of major depression. *Id.*

### c.   Treatment from Stephen A. Quittman, Ph.D

After leaving treatment at Good Samaritan, Fratello began seeing Stephen A. Quittman, Ph.D, a licensed psychologist, on March 20, 2011, and continued with him through the time of the ALJ hearing, with a "hiatus" between April 17, 2011 and September 9, 2011 according to Quittman's therapy notes. *Id.* at 51, 343 (noting that Fratello returned to treatment on advice of attorney). Quittman's notes state that Fratello was depressed following the break-up of his abusive relationship and had high anxiety levels that precluded his working. *Id.* They indicate a lack of progress during the months of therapy, Fratello's lack of motivation and hopelessness, and his refusal to take medication. *Id.*

On October 28, 2011, Quittman completed a report that summarized Fratello's symptoms as: "lack of focus, poor memory . . . , frequent crying episodes, avoidance of people and responsibilities, listlessness." *Id.* at 339. Quittman characterized as "moderate" Fratello's ability to remember instructions and respond appropriately to supervision, with a mild limitation to his ability to respond to co-workers, and a severe limitation in his ability to satisfy an employer's

6

production and attendance standards. *Id.* at 339-40. Quittman opined that Fratello was capable of tolerating low stress at work, but that his mental problems would result in his missing work at least three times per month. *Id.* at 341. Fratello was diagnosed with severe anxiety and depression interfer[ing] with functioning." *Id.* at 342. His GAF was stated as 50. *Id.* at 340.

### d. Assessment by Non-Treating Source

On December 27, 2010, a medical consultant, L. Hoffman, completed a mental Residual Functional Capacity ("RFC") assessment of Fratello. *See id.* at 299-315. Hoffman evidently consulted Fratello's medical records in preparing this assessment, including a "2008 record from Dr. Brickett [sic]," "2009 records" from Summit, and a "11/10 report from Good Samaritan." *Id.* at 315. Hoffman listed Fratello's current GAF as 55 and concluded that, "despite a medical impairment, [Fratello] is able to understand and remember instructions, sustain attention and concentration, respond and relate adequately to others, and adapt to changes." *Id.* Hoffman added that a "low contact setting may be beneficial" for Fratello. *Id.*

### 3. Hearing Before the ALJ

According to the December 28, 2011 hearing transcript, before Fratello entered the hearing room, ALJ Sochaczewsky expressed skepticism to Fratello's attorney about Fratello's ability to meet the requirements of disability, particularly given the months-long breaks in his treatment at Summit in 2009 and with Dr. Quittman in 2011. *Id.* at 36-40. The ALJ then heard from Fratello, who, after testifying about his employment history, *id.* at 46-48, explained that he had taken the hiatuses from treatment because he "didn't believe it was really helping too much" and found "talk[ing] about the same things week after week . . . troubling." *Id.* at 48-49. Fratello also explained that he no longer took medication for his mental health problems because he consistently had negative reactions and, "rather than be depressed and anxious and have side

7

effects, [he would] rather just be depressed and anxious." *Id.* at 50. Lexapro made him feel "spaced out and numb," and caused nausea and weight gain, Fratello added, while Remeron made him exhausted, and Wellbutrin nervous and anxious. *Id.* at 58.

Fratello then discussed the limitations caused by his condition, explaining that he experienced depression during one to two weeks each month that made it difficult for him to get out of bed. *Id.* at 51. Although there were days that Fratello cooked and did laundry, he did not go shopping when he knew he would encounter crowds. *Id.* at 52. However, he testified that he attended church once or twice each month, went out walking and to an occasional movie, and visited with a cousin who lived nearby. *Id.* He read and watched television, but he explained that he "space[d] out" and had problems with concentration when stressed. *Id.* at 52-53.

When asked about his ability to work, Fratello stated that he had "never been able to hold a job because of this illness" and that he did not believe he could return to his prior work in retail. *Id.* at 55-56. He described feeling a "constant sadness" and "performance anxiety" from having to pass evaluations on the job. *Id.* at 58-59.

Finally, Fratello's counsel provided a closing statement, in which he stressed Fratello's "continuity of treatment" and characterized the breaks in treatment as reasonable for a person with severe depression who is discouraged when symptoms are not alleviated. *Id.* at 60.

## II.    DISCUSSION

### A.    Legal Standards

#### 1.    Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final

8

decision applied the correct legal standards and whether the decision is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U. S. 389, 401 (1971)) (internal quotation marks and alterations omitted). In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d

9

at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### 2.   Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In general, when assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)); *see also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations omitted).

### a.   Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.l (2d Cir. 2013) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, the Commissioner continues on to the fourth step, determining whether the claimant has the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

Where an alleged impairment is based on an affective or mood disorder, it is considered to be "listed" as a qualifying impairment at step three of the analysis if it satisfies one of two alternative sets of criteria. The first, the "paragraph B" criteria, states that an impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, or diminished functioning, each of

11

extended duration. 20 C.F.R. Pt. 404, Subt. P, App. 1, § 12.04(B).   To be listed under the

second, the "paragraph C" criteria, the claimant must show a:

> [m]edically documented history of a chronic affective disorder of at least 2
> years' duration that has caused more than a minimal limitation of ability to
> do basic work activities, with symptoms or signs currently attenuated by
> medication or psychosocial support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended
> >    duration; or
> >
> > 2. A residual disease process that has resulted in such marginal
> >    adjustment that even a minimal increase in mental demands or
> >    change in the environment would be predicted to cause the
> >    individual to decompensate; or
> >
> > 3. Current history of 1 or more years' inability to function outside
> >    a highly supportive living arrangement, with an indication of
> >    continued need for such an arrangement.

*Id.* § 12.04(C). According to the regulations, "marked" is defined as "more than moderate but

less than extreme.  A marked limitation may arise when several activities or functions are

impaired, or even when only one is impaired, as long as the degree of limitation is such as to

interfere seriously with [the claimant's] ability to function independently, appropriately,

effectively, and on a sustained basis." *Id.* § 12.00(C).

### b.   Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining

whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*,

No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R.

§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).  However, a treating physician's

opinion is given controlling weight — that is, it is binding — provided the opinion as to the

nature and severity of an impairment "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

12

[the] case record." 20 C.F.R. § 404.1527(c)(2); *see Selian*, 708 F.3d at 418 ("The opinion of a

treating physician on the nature or severity of a claimant's impairments is binding if it is

supported by medical evidence and not contradicted by substantial evidence in the record.")

(citing *Burgess*, 537 F.3d at 128 and *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir.

2003)). The regulations define a treating physician as the claimant's "own physician,

psychologist, or other acceptable medical source who provides [the claimant] . . . with medical

treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the

claimant]." 20 C.F.R. § 404.1502. Deference to such a medical provider is appropriate because

they "are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of [the] medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical evidence alone or from reports of

individual examinations." 20 C.F.R. § 404.1527(c)(2).

     Under certain circumstances, however, a treating physician's opinion will not be

controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work'

is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*,

No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(l), 416.927(e)(l)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A

treating physician's statement that the claimant is disabled cannot itself be determinative.").

Additionally, where "the treating physician issued opinions that [were] not consistent with other

substantial evidence in the record, such as the opinion of other medical experts, the treating

physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at

*15 (quoting *Halloran*, 362 F.3d at 32) (internal quotation marks omitted) (alteration in

original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion

is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record.[2] Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion,

---

[2]     "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). Specifically, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)).

the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of

determining weight to be afforded does not "exempt administrative decisionmakers from their

obligation . . . to explain why a treating physician's opinions are not being credited")

(referencing *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).[3]  The regulations require

that the SSA "always give good reasons in [its] notice of determination or decision for the

weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d

Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to

remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013

WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original)

(internal quotation marks omitted).

    The courts leave it to the finder of fact to resolve any conflicts there may be in the

medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical

testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler*,

725 F.2d 174, 176 (2d Cir. 1983)).  A court may not substitute its judgment so long as the

decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings

supported by evidence having rational probative force." *Galiotti*, 266 F. App'x at 67 (quoting

*Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)).

### c.    Claimant's Credibility

    As to the credibility of a claimant, here, too, the reviewing court must defer to an ALJ's

findings. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May

---

3       On March 26, 2012, a portion of 20 C.F.R. § 404.1527 was modified.  The section that
described the factors for an ALJ to consider when deciding how to weigh a treating physician's
opinion was moved from subsection (d)(2) to (c)(2).

30, 2006). "In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ

must first determine that there are 'medical signs and laboratory findings which show that [the

claimant has] a medical impairment which could reasonably be expected to produce the pain.'"

*Vargas v. Astrue*, No. 10-CV-6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011)

(quoting *Snell*, 177 F.3d at 135 and 20 C.F.R. § 404.1529(a)). So long as the "findings are

supported by substantial evidence, the court must uphold the ALJ's decision to discount a

claimant's subjective complaints of pain." *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte v.

Sec'y of Health and Human Servs. of the U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)). However,

these findings must "be set forth with sufficient specificity to permit intelligible plenary review

of the record." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y.

Dec. 3, 2008) (internal quotation marks omitted) (quoting *Williams*, 859 F.2d at 260-61).

      Because subjective statements about symptoms alone may not establish a disability, the

ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *Genier v.

Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must

weigh whether "the claimant suffers from a medically determinable impairment that could

reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)).

If the answer to the first step of the analysis is yes, the ALJ proceeds to the second step,

considering "the extent to which [the claimant's] symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence of record." *Id.* (citing

20 C.F.R. § 404.1529(a)) (internal quotation marks omitted). Because "an individual's

symptoms can sometimes suggest a greater level of severity of impairment than can be shown by

the objective medical evidence alone," the ALJ may take into account a variety of other

considerations as evidence. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL

16

374186, at *3 (SSA July 2, 1996)). These include: a claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that aggravate the symptoms; treatment and medication necessitated by the pain or other symptoms and their effects; other alleviating measures taken by the claimant; and other factors that relate to the claimant's functional limitations and restrictions stemming from pain or other symptoms. *Id.* (citing SSR 96-7p, 1996 WL 374186, at *3).

**B.    The ALJ's Decision**

Finding that Fratello was not presently employed and was suffering from the severe impairments of depressive disorder and anxiety disorder, the ALJ proceeded to the third step of the disability inquiry: whether Fratello's conditions met or equaled the severity of a "listed" impairment. R. at 20.  The ALJ concluded that they did not, characterizing Fratello's limitations in daily living, social functioning, and concentration as mild, with no episodes of decompensation,[4] based on his testimony about his ability to shop, do laundry, go to church, and socialize. *Id.* at 21.  Given the lack of sufficiently serious limitations, the ALJ found that Fratello did not meet either the paragraph B or paragraph C criteria for a finding of disability based on a mood or affective disorder under SSA regulations. *Id.*

The ALJ subsequently proceeded to step four of the analysis, finding that Fratello had the RFC to perform a full range of work, subject only to moderate nonexertional limitations, namely an inability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities on a schedule, work in coordination with others, and interact with the

---

[4]    "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. § 404, Subpart P, Appendix 1, 12.00(C)(4).

17

general public. *Id.* at 21-22.  The ALJ determined that Fratello's impairments could not

reasonably be expected to cause his claimed symptoms, giving "significant weight" to the

opinion of the SSA consultant, Hoffman, while emphasizing the gaps in Fratello's treatment as

reasons to question his credibility as well as to discount the opinion of his treating physician, Dr.

Quittman.  *Id.* at 23.  In particular, the ALJ concluded that "the evidence does not support a

finding that some type of medication regimen could not assist [Fratello]."  *Id.*

     Consequently, at the fifth and final step, the ALJ found that, given Fratello's RFC, age,

and other background factors, sufficient jobs existed in the economy that Fratello could perform.

*Id.* at 24.

## C.    Analysis

### 1.    The ALJ Failed to Properly Weigh the Medical Evidence

     Fratello challenges the ALJ's determination on the basis that it failed to afford proper

deference to the opinion of Dr. Quittman as his treating psychologist while giving undue weight

to the opinion of the SSA consultant, a non-examining source.  Pl. Mem., at 12-15, 18-19.  As

discussed above, Quittman diagnosed Fratello with severe anxiety and depression that would

interfere with functioning, and opined that Fratello was hindered by a severe limitation in terms

of meeting workplace productivity and attendance standards. R. at 339-42.  The Commissioner

counters that Quittman's "overly restrictive" assessment of Fratello's limitations was not

supported by the other medical evidence in the record and thus the ALJ was entitled to assign

limited weight to it.  Def. Mem., at 15-17.  After reviewing the record, the Court finds itself in

agreement with Fratello.

#### a.    Dr. Quittman Was a Treating Physician

     As a threshold matter, the Commissioner contests whether Quittman's opinion qualifies

for treating-physician deference because "he saw [Fratello] for only two very short treatment periods . . . from March 20, to April 17, 2011, and then . . . in September and October 2011." *Id.* at 17. According to SSA regulations, a treating source is afforded greater weight once he has examined the claimant "a number of times and long enough to have obtained a longitudinal picture of [the alleged] impairment." 20 C.F.R. § 404.1527(c)(2)(i). Importantly, there is no arbitrary, minimum period of treatment by a physician before this standard is considered met. Indeed, "SSA adjudicators [should] focus on the *nature* of the ongoing physician-treatment relationship, rather than its *length*." *Schisler v. Bowen*, 851 F.2d 43, 45 (2d Cir. 1988) (emphases added) (upholding draft Social Security Ruling clarifying that treating physician's "ongoing" relationship with claimant may be "of a short time span"). *See also Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) ("The nature – not the length – of the [physician-patient] relationship is controlling."); *Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir. 1990) (applying treating physician rule where doctor saw patient for only three months).

By the time of the ALJ hearing, Quittman had seen Fratello ten times between March and October 2011. R. at 343. While the record contains relatively few pages of notes from Quittman – at least in comparison with those from Summit or Good Samaritan – he evidently had enough of a treatment relationship with, and professional opinion of, Fratello to complete a four-page mental health function questionnaire by October 28, 2011. *Id.* at 339-42. Moreover, overlooked by the Commissioner, Fratello continued to see Quittman after October and through the date of his ALJ hearing in December 2011, *id.* at 51, lending further support to the "continuity of treatment [Quittman] provide[d] and the doctor/patient relationship he develop[ed]." *Mongeur*, 722 F.2d at 1039 n.2; *see also Manney v. Astrue*, No. 09-CV-255 (JMC), 2010 WL 3766993, at *13 (D. Vt. July 23, 2010) (psychologist with "approximately ten contacts" with claimant

19

considered treating physician), Report and Recommendation, *adopted*, 2010 WL 3766966 (D.

Vt. Sept. 27, 2010). Accordingly, Quittman qualifies as a treating physician, and as such, was

owed appropriate deference.

### b. The ALJ Did Not Provide Good Reasons for Discounting Quittman's Opinion in Favor of Relying on the SSA Consultant

In contrast to the "diminished" weight given to Quittman's opinion, the ALJ gave

"significant" weight to that of the SSA consultant, L. Hoffman, R. at 23, who found that Fratello

was capable of following instructions and sustaining attention despite his psychiatric impairment.

*Id.* at 315. Fratello argues that this reliance on the consultant, who did not examine Fratello but

instead based his conclusion on a review of other medical records, was improper because this

opinion was not adequately supported by the evidence. Pl. Mem., at 13. In particular, Fratello

points out that the consultant, who filed his report in December 2010, did not evaluate all the

medical records from Fratello's treatment at Good Samaritan, which ran through March 2011, or

any of the notes from his therapy with Quittman, which occurred throughout 2011, as part of his

report. *Id.* The Commissioner asserts that the consultant nonetheless reviewed "a very large part

of the record," and that the ALJ was entitled to rely on his opinion. Def. Mem., at 19.

As part of his discretion, an ALJ is permitted to give more weight to a non-treating

source, even where it means discounting a treating physician's opinion. *See Diaz v. Shalala*, 59

F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations . . . permit the opinions of nonexamining

sources to override treating sources' opinions provided they are supported by evidence in the

record.") (citing *Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d Cir. 1993)); SSR 96-6p, 1996 WL

374180, at *3 (July 2, 1996). However, it is incumbent upon the ALJ to provide good reasons

for doing so, by analyzing the various relevant factors that justify why the treating physician's

evaluation should not be afforded its ordinarily controlling weight. *See Halloran*, 362 F.3d at

33; *Snell*, 177 F.3d at 133. Moreover, where the ALJ relies instead on the opinion of a non-treating source in particular, as was the case here, he must take care to justify such reliance: "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [given to] their opinions will depend on the degree to which they provide supporting explanations." 20 C.F.R. § 404.1527(c)(3). The ALJ's analysis of Quittman's and the consultant's respective opinions failed to satisfy these requirements.

While briefly summarizing some of the findings from the earlier Summit and Good Samaritan records, the ALJ failed to acknowledge Quittman as Fratello's treating psychologist. R. at 22-23. Instead, the ALJ evaluated Quittman's opinion as if it were on equal terms with all other medical sources, and dismissed it based solely on the gap in Fratello's treatment. *Id.* at 23. The Second Circuit has made clear, however, that the length of treatment is but one of several factors an ALJ must assess in justifying why lesser weight may be given to a treating physician's opinion. *See Halloran*, 362 F.3d at 32. Thus, even if the ALJ was permitted to draw a negative inference from the fact that Fratello took such a break in treatment, his reliance on this one detail to discount a treating physician's evaluation, without explicitly analyzing any of the other factors, was error. *See, e.g.*, *Saldin v. Colvin*, No. 13-CV-4634 (ADS), 2014 WL 3828227, at *13-14 (E.D.N.Y. Aug. 4, 2014) (ALJ erred by failing to consider relevant factors, including length of treatment, evidence in record supporting treating physician, consistency of opinion with record, and specialization of treating physician); *Benson v. Astrue*, No. 09-CV-8973 (JGK) (RLE), 2011 WL 4542939, at *12 (S.D.N.Y. Sept. 7, 2011) (remand where unclear which factors ALJ relied upon), Report and Recommendation, *adopted*, 2011 WL 4538440 (S.D.N.Y. Sept. 30, 2011).

For example, the ALJ should have engaged in a meaningful analysis as to whether

Quittman's opinion was consistent with the rest of the record. The Commissioner, in support of her cross-motion, belatedly offers such an analysis, arguing that Quittman's opinion was inconsistent with the medical evidence on the whole. She cites to various instances in earlier treatment notes from Summit and Good Samaritan in which Fratello was described, *inter alia*, as "alert," "fully oriented," "dressed appropriately," and having "intact attention." Def. Mem., at 17-18 (citations omitted). The Commissioner also argues that Fratello's GAF scores, ranging from 50 to 60, support the ALJ's finding that Fratello had only moderate limitations. *Id.* at 18 (citations omitted). However, the Commissioner's characterization of the evidence is incomplete.

The same notes cited to by the Commissioner are also replete with notations of Fratello's impaired concentration, *see, e.g.*, *id.* at 241, 252, 254, 288; impaired attention, *id.* at 252; impaired judgment, *id.* at 246; and sleep disturbance, *id.* at 253, 288. More importantly, the records consistently reflect Fratello's ongoing diagnosis of panic and major depressive disorders, *see, e.g.*, R. at 259, 279, 317 (diagnosed in December 2008, September and November 2010, and March 2011), and even potentially PTSD, *id.* at 317 (March 2011), diagnoses which the Commissioner does not acknowledge. Moreover, that the medical records reflect GAF scores between 50 and 60 is not significant *in itself* to justify the ALJ's conclusion that a claimant is not severely limited in functioning. *See, e.g.*, *Chandler v. Soc. Sec. Admin.*, No. 12-CV-155 (CR), 2013 WL 2482612, at *9 (D. Vt. June 10, 2013) ("[A] claimant's GAF score is not dispositive of her ability to work but is 'one factor' for the ALJ to consider in determining whether the claimant is disabled.") (citation omitted). The ALJ should have discussed *all* aspects of the record in comparison with Quittman's assessment in determining what level of deference was owed to that opinion.

22

In addition, the only justification the ALJ provided for why the consultant's opinion was given significant weight was that it was "consistent with the record as a whole." R. at 23. Yet no specific examples were given to substantiate this conclusory statement, nor was any analysis made of any of the contrary indications in the record of Fratello's diminished functioning. Indeed, the consultant's assessment, a cursory three-paragraph summary, reveals a very superficial engagement with the medical evidence: after providing a limited account of Fratello's reported panic attacks, PTSD symptoms, and his diagnosis of panic disorder, it concludes summarily, "on the totality of the evidence," that Fratello could understand instructions, sustain attention and concentration, and adapt to changes. *Id.* at 315. Not only is the assessment devoid of an explanation of how the consultant reached these conclusions based on the medical reports, it was prepared before, and without the benefit of, any of Quittman's evaluation or the final months of records from Good Samaritan in 2011. The ALJ's singular deference to this sort of report, given its brevity and lack of access to the full evidentiary record, demanded a particularly compelling supporting explanation, with specific references to other evidence lending credence to the non-treating opinion. *See Savage v. Comm'r of Soc. Sec.*, No. 13-CV-85 (JMC), 2014 WL 690250, at *7 (D. Vt. Feb. 24, 2014) (ALJ's reliance on a non-treating source upheld where supported specifically by other parts of medical record); *Conte v. Astrue*, No. 08-CV-01185 (DNH), 2010 WL 2730661, at *8 (N.D.N.Y. June 21, 2010), Report and Recommendation, *adopted*, 2010 WL 2730652 (N.D.N.Y. July 7, 2010). The absence of such an explanation further renders the ALJ's relative weighing of the medical opinions error as a matter of law, and it should be corrected on remand to the Commissioner. *See, e.g.*, *Gjeci v. Comm'r of Soc. Sec.*, No. 13-CV-6539 (KBF), 2014 WL 3408263, at *8 (S.D.N.Y. July 7, 2014) (remanding for ALJ

23

to "reweigh all medical opinions in the record appropriately").[5]

## 2.    The ALJ Improperly Offered His Own Medical Opinion Concerning the Efficacy of Medication to Treat Fratello

Finally, Fratello also argues that the ALJ improperly interjected his own lay opinion, without a basis in the medical testimony, when he concluded that "the evidence does not support a finding that some type of medication regime could not assist [Fratello] with his condition." R. at 23. Although I believe that remand to the Commissioner is the proper result based on the errors discussed above, I address Fratello's contention because I agree that the ALJ reached an improper conclusion that should also be reconsidered on remand.

Fratello testified at his hearing that he stopped taking medication for his depression and anxiety because he believed the side effects, including increased anxiety, were worse than the initial symptoms it was designed to alleviate. *Id.* at 50. The Commissioner contends that this admission, as well as indications in the record that treatment providers suggested, but Fratello refused, different medication regimens, constituted a sufficient basis for the ALJ to discount Fratello's credibility. Def. Mem., at 22. Credibility determinations, including a claimant's characterizations about symptoms and compliance with medication, are indisputably the purview of the ALJ. *See Pena*, 2008 WL 5111317, at \*11; SSR 96-7p, 1996 WL 374186, at \*7 ("[T]he individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this

---

[5]     Fratello seeks a reversal of the Commissioner's determination, requesting a remand for further proceedings before the ALJ only in the alternative. Pl. Mem., at 1, 20. Outright reversal, however, is an "extraordinary" remedy that is "proper only when further development of the record would serve no purpose." *Purisima v. Astrue*, No. 12-CV-3528 (WHP) (JLC), 2013 WL 772702, at \*7 (S.D.N.Y. Mar. 1, 2013) (citing *Calzada v. Astrue*, 753 F. Supp. 2d 250, 270 (S.D.N.Y. 2010)), Report and Recommendation, *adopted*, 2013 WL 3055332 (S.D.N.Y. May 30, 2013). As explained herein, remand is appropriate so that the ALJ may reweigh the medical record according to the correct legal standards.

24

failure."). However, the finding by the ALJ in question here was not a credibility assessment, but rather a medical conclusion: that there existed, definitively, some medication regime that *would have* helped Fratello's condition.

The Court finds no basis in the medical record, at least at present, to enable the ALJ to reach such a conclusion – that is, even if some examining sources may have believed that alternative medication *may* have been effective for Fratello without the problematic side effects, none of the professionals treating him established, or even suggested, this possibility as a *fact*. "In the absence of a medical opinion to support [a] finding . . . , it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983)) ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician.") (internal quotation marks omitted). Accordingly, before the ALJ can conclude that medication was available to assist Fratello, he should first develop the medical evidence pertaining to this question on remand. *See Schaal*, 134 F.3d at 505 ("[I]f the clinical findings were inadequate, it was the ALJ's duty to seek additional information.").

## III.   CONCLUSION

For the foregoing reasons, I recommend that Fratello's motion for judgment on the pleadings be granted, the Commissioner's cross-motion be denied, and the case be remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). Specifically, I recommend that, on remand, the ALJ should:

25

(1)     Provide a clear and comprehensive statement of the "good reasons" why

Quittman's opinion should not be afforded controlling weight, consistent with the

Court's discussion above (should that remain the ALJ's conclusion following

remand);

(2)     Determine what weight should be given to Quittman's opinion, if it is not deemed

to be controlling, and what weight should be given to other medical opinions in

the record, based on the appropriate factors outlined above; and

(3)     Further develop the evidentiary record, including by soliciting further medical

opinions, as to whether some medication regime could be effective in limiting

Fratello's impairments before making a conclusion on this issue.

## PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Vernon S. Broderick, United States Courthouse, 40 Foley Square, New York, New York, and the

chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York

10007. Any requests for an extension of time for filing objections must be directed to Judge

Broderick.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL**

**RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE**

**REVIEW**. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985);

26

*Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596

F.3d 84, 92 (2d Cir. 2010).

Dated: New York, New York
     August 26, 2014

JAMES L. COTT
United States Magistrate Judge

27